UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 23-CR-218 (DSD/DTS)

UNITED STATES OF AMERICA,

         Plaintiff,

                             **GOVERNMENT'S POSITION**
    v.                        **REGARDING SENTENCING**

CHARLES EDWARD FIELDS,

         Defendant.

The United States of America, by Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorney Matthew S. Ebert, hereby submits this position paper as to sentencing factors. As set forth below, the government respectfully requests that this Court sentence defendant Charles Fields to a term of imprisonment of 63 months at the low end of the advisory Guidelines range. Such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing in light of Fields's characteristics and conduct, which includes fraudulently taking almost $600,000 from nearly 200 victims.

## I.    <u>Charles Fields's Scheme to Defraud</u>

From August 2015 to January 2020, Charles Fields defrauded victims nationwide who were simply looking for a job to help them make ends meet. The purpose of Fields's scheme was simple yet brazen. Fields pitched phony sales and marketing jobs nationwide through on-line postings. The employment opportunities that Fields purported to provide from 2015-2020 were through his businesses, which included HOMESoft Systems Incorporated, WaterTek Marketing Corporation, W I G Holdings Corporation, Water Innovations Group, Inc., Mile High H20 Corporation,

and the NEW H20.  Fields initially overtly registered his companies in his own name in Minnesota, but his direct involvement became significantly more veiled over time. He shifted the names of companies over time to avoid detection and to distance himself from previous consumer complaints.  However, regardless of the particular iteration, there was one constant to Fields's business: it was a scam.

Fields offered lucrative jobs (and related equipment, training, and support) that never materialized in exchange for upfront deposits from job applicants.  Fields posted employment advertisements with lucrative offers through online platforms, such as Craigslist, at targeted locations throughout the country.  His job postings typically claimed that individuals hired as supposed sales "group presenters" would earn a base monthly salary of $5,000 or, in other instances, would earn $6,000 in guaranteed monthly profit.  At other times, Fields's online advertisements claimed that his workers would supposedly receive $100,000 in their first year.

There was a crucial catch, however.  Through his successive companies, Fields claimed that, after job applicants paid an upfront deposit or fee, then he would purportedly hire them as sales contractors to sell products nationwide to the public, primarily, selling home security or water filtration systems.  To sell for Fields, he required his salespeople to buy the product themselves, typically a water purification system called "K-8," or "Kangen" units.   Getting this equipment (which cost job applicants roughly $5,000) was supposedly a requirement to land the lucrative sales jobs that Fields promised.  In one recorded sales pitch, Fields told a job candidate, "If

2

you want to be a successful, a high-level successful distributor, it is a must that you get a K-8 [water machine]." In another recorded sales pitch, Fields can be heard trying to assure prospective workers, "We're not like some, you know, company in a garage that just created a website and said, 'Hey, send us money.' That's not what it is." Unfortunately, for Fields's victims, that is *exactly* what it was. Fields tricked applicants with contracts and paperwork (and oral sales pitches) indicating that their money was safe in escrow and was further protected by a 90-day money-back guarantee. Some of the victims' paperwork indicated that "the entire purchase price is refundable." However, for dozens of Fields's victims, that was all a lie.

Fields represented that he would provide his workers with secure and lucrative jobs with guaranteed training, support, sales leads, and compensation, among other things. However, most of the individuals who accepted sales contractor job offers from Fields subsequently realized the employment opportunity never materialized as Fields promised. After paying the required upfront deposit to Fields, many victims never received the product or training that they purchased as a condition of their employment. Fields either kept the victims' money or, in other instances—after victims demanded money back—Fields provided some victims with refunds that were late and/or incomplete, or were actually funded by other victims' money.

Fields further deceived job applicants and sales contractors by hiding behind various alias names of purported business partners to conceal his involvement or enhance the apparent size and legitimacy of his businesses. Fields often

3

communicated with sales contractors through email messages, phone calls, and recorded audio messages, often while using a false persona of a non-existent representative from one of his businesses.  The fake names Fields created and used included "David Mueller" and "Michael Brunn," among others.  To maintain the façade, Fields gave each fake persona a unique business email address, and sham job titles such as Vice President of Sales, National Sales Director, and National Sales Manager.  As a result, few of the victims were actually aware that these fraudulent businesses were largely one-man outfits run by Fields himself.

When it suited his purpose, Fields would routinely "shutter" one of his companies, stop all contact with those particular victims, and thereafter relaunch under a new company name, all of which left his existing (and prospective victims) largely in the dark.  For example, after Fields's WaterTek Marketing was rightfully tarnished online with victim complaints, he simply refashioned his operations as "Water Innovations Group," and eventually subsequently shifted to "MileHigh H2O" or "The NEW H2O."  However, other than some superficial tweaks to the business name and logo, Fields's fraud fundamentally remained the same each time.  Fields further deceived victims by misrepresenting his claimed affiliation with Enagic, which is a long-standing international company that designs and distributes various models of water purifier machines and filtration systems.  Fields mischaracterized his relationship with—and his authority to act on behalf of—Enagic and its products to deceive potential contractors by legitimizing the appearance of his operations.

4

To conceal the scheme and avoid scrutiny, Fields offered bogus and shifting excuses to the victims for why he was supposedly unable to fulfill his promises or return their funds. In some instances, when victims complained or requested their money back, Fields sought to dissuade them from lodging complaints elsewhere. In other instances, he stopped communicating with the victims entirely. To provide a sense of the ordeal the victims encountered with Fields, below are a few examples of subject lines from email messages that victims exchanged over the years with addresses controlled by Fields (albeit with an alias like "Michael Brunn" or "David Mueller"):

- "Re: Fw: Your complaint has been received";
- "Re: Where's my money";
- "Re: I'm tired of this back and forth";
- "Re: Kangen8 Water machine never arrived";
- "Re: 'WTF.. What did I get mtyself [sic] into???'";
- "Re: I want my money";
- "Re: Why are you ignoring me";
- "Re: OMG, who are you people?";
- "Re: You just STOLE $500 money from my account!!!!!"; and
- "Re: Bad Business Immediate Action Required."

Some victims pleaded with "Michael" (Fields) to provide their money back (or to have the promises fulfilled), like the email example below:

On Wed, Oct 3, 2018 at 10:49 AM <preston.patton@watertekmarketing.com> wrote:

> Michael – Please provide me with some sort of update. My livelihood is at stake here. We just moved a month ago, and I am now unable to pay rent my first month in. I have a wife and daughter that are relying on me and my ability to generate income. We are in serious turmoil here, and I'm struggling to find a way to even feed my family. I need to know what's going on.

As the victims' statements in the PSR make clear, Fields's fraud caused substantial harm—both emotionally and financially. (PSR at pp. 6-12.) For example, Victim C.L. explained the terrible impact, as follows:

> "I was desperate for a job. Being in sales was tough. He offered me this opportunity. It sounded so logical. By the time he told me about the thousands I was already sold. I had to borrow the money. Because of this scam I was evicted, homeless, and destitute. I lost relationships, and it took years to recover. I was very suicidal. This almost ended me."

(PSR at p. 7.) Similarly, Victim D.N. wrote, "I am a single mom and I gave this company everything I had in savings for the opportunity of having a business I could work from home. They made a lot of promises, I never got the Enagic Kangen Machine that I paid for. Losing this money was financially devastating for me and my kids and created a hardship!" (*Id.*) The PSR, without dispute, establishes that at least 25 victims incurred "substantial financial hardship," as defined by the Sentencing Guidelines (PSR ¶¶ 25, 33.)

As a final component of his criminal conduct, Fields obstructed justice by concealing and trying to destroy evidence of his fraud scheme, which is set forth without dispute in the PSR. (PSR ¶¶ 22, 28, 36.) Specifically, several months after federal agents executed a search warrant at his Blaine residence, a resident of Anoka County, Minnesota (who lived approximately 12 miles from Fields's home) contacted

6

local police to report finding unauthorized bags of shredded documents that had been mysteriously discarded in the resident's curbside trash can. The resident discerned that some of the shredded documents referenced the name "Charles Fields," whom the resident then discovered via open-source media research was the subject of an ongoing investigation. After local police transferred the shredded materials to the FBI, a portion of them were subsequently reassembled by a specialized unit at an FBI laboratory in Quantico, Virginia. As a result of those efforts, the FBI found Fields's fingerprints on the shredded documents, and meticulously pieced together more evidence of his fraud (as excerpted below), including a victim's check, business records, and a fake Minnesota driver's license with Fields's photo (but with one of his aliases, "David Mueller"):

 






Ultimately, Fields's five-year fraud scheme resulted in approximately 200 payors providing over $900,000 to his series of businesses (including HOMESoft and the subsequent water companies), with nearly $600,000 in sustained actual losses (after accounting for individuals who received partial or full reimbursements from Fields).

## II.   <u>PSR and the Advisory Guidelines Range</u>

As set forth in the PSR, the **base offense level is 7** for the offense of conviction pursuant to U.S.S.G. § 2B1.1(a)(1). (*Id.* at ¶ 31.) The offense level is **increased by 14** levels pursuant to § 2B1.1(b)(1)(H) because the amount of loss attributable to the crime of conviction is more than $550,000 but less than or equal to $1,500,000. (*Id.*

at ¶ 32.)  The offense level is also **increased by 6 levels** pursuant to § 2B1.1(b)(2)(C) because Fields's offense resulted in substantial financial hardship to 25 or more victims.  (*Id.* at ¶ 33.)  The offense level is also **increased by 2 levels** pursuant to § 3C1.1 because Fields attempted to obstruct or impede the administration of justice with respect to the investigation of the offense of conviction.  (*Id.* at ¶ 33.) The offense level is **decreased by 3 levels** pursuant to § 3E1.1(a) and (b) because of Fields's acceptance of responsibility.  (*Id.* at ¶¶ 39-40.)

Thus, the advisory sentencing guideline range, as calculated by the Probation Officer and to which there is no dispute from the parties, is 63-78 months of imprisonment plus restitution.  (*Id.* at ¶ 80.)  Based upon the most recent information obtained from the victims, the current restitution amount—$598,893.71—is now slightly lower than restitution figures the government provided Probation previously.

## III.  <u>Sentencing Factors</u>

The government respectfully asserts that a sentence of 63 months' imprisonment is appropriate.  The sentencing factors under 18 U.S.C. § 3553 most pertinent to this case—namely, (1) the nature and circumstances of the offense; (2) Fields's history and characteristics; and (3) the need for the sentence to promote respect for the law and to afford adequate deterrence—are addressed below.

### A.   *A Sentence of 63 Months Will Reflect the Seriousness and the Nature and Circumstances of the Offense.*

Fields's fraud scheme was a serious offense, and his sentence should reflect as much. Far from a fleeting lapse in judgment, Fields instead unlawfully took funds

repeatedly over a span of approximately five years.  In order to carry out and conceal his offense, Fields tricked people as a matter of routine on virtually a daily basis. Fields's crime was elaborate and took constant planning and calculation, including his creation of fake names, multiple email accounts, and multiple businesses.  In so doing, Fields caused devastating losses to workers whom he was supposed to support, all so that he might benefit himself at their substantial expense and detriment.

His crime is all the more egregious and serious considering the nature of his victims, many of whom were workers with limited means who trusted and relied upon Fields for a job to help keep food on the table and a roof over their heads.  The victims' words, as summarized in the PSR, poignantly capture the seriousness of the offense and the significant impact that Fields's crime has had on their lives.  For example, Victim S.L. noted that, "I am a wife, mother, daughter, and member of my local community taken advantage of by this con artist . . . The amount of time spent with [Fields] while he deceived me was astonishing. To spend so much time deceiving people rather than just having a good business plan is astonishing ..."  (PSR at 11.) Victim S.L. elaborated that, "while chatting, [Fields] made up a wonderful story about how he was at his son's soccer game, creating a family man façade . . . This became a financial hardship for my family and extensive stress. It was embarrassing to be taken advantage of by a con artist, the financial difficulties distracted our lives, and to this day we are still traumatized from being taken advantage of by someone who seemed so nice." (*Id*. at 11-12.)

The seriousness of this crime is further revealed by the harm inflicted on Victim R.K., who wrote:

> "I started this job less than 1 year after chemo treatment for breast cancer … Michael Brun[n], a.k.a. Charles Fields, took complete advantage of me, never paid me, and when he did they bounced checks. I had to borrow money from family during this time to survive. WaterTek put me in debt and ruined my good credit which affected my life to come . . . This was a very emotional and stressful time in my life. I learned a lesson. So should he."

(*Id.* at p. 11.)

In light of Fields's conduct, the government respectfully submits that a sentence of 63 months within the Guidelines range is appropriate and would reflect the seriousness and the nature and circumstances of his fraud.

**B.     *A Sentence of 63 Months Will Account for Fields's History and Characteristics.***

Fields's history and characteristics, as detailed in the PSR, reflect a mixed picture.  He is the product of a solid middle-class upbringing.  In his youth, Fields and his family were actively involved in school and church activities.  (PSR at ¶¶ 56-58.)  He pursued his education after high school, had three children with his wife, and supported his family financially through various jobs over the years prior to commencing this fraud scheme.  (PSR at ¶¶ 58-59; 71-73.)  Fields has no significant criminal history, and he resolved these charges swiftly. The government acknowledges the aspects of Fields's history and characteristics that are positive, which the government respectfully submits should be considered in mitigation in fashioning an appropriate sentence.

However, given his upbringing, supportive family, and other job skills, Fields's decision to commit egregious fraud for half a decade is certainly puzzling and troubling.  The record in this case reveals that Fields had every opportunity to succeed through honest work, and so he did not initiate his fraudulent scheme in response to economic hardship.  For reasons that are not entirely clear, Fields affirmatively chose dishonesty and fraud—not to avoid deprivation—but to live comfortably for years at his victims' expense.

It is significant and revealing that Fields committed this crime without the usual financial hardships or lack of opportunities that might cause some to resort to crime.  *See, e.g., United States v. Anderson*, 517 F.3d 953, 966 (7th Cir. 2008) (noting that district court considered that "[w]hile many criminals commit crimes from lack of opportunity and desperation, [defendant] acted out of greed.").  As Judge Posner aptly noted about defendants like Fields:

> … no "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity.  (Citation omitted.).  It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999).

12

That Fields certainly had the family support and professional skills to live comfortably, *without* resorting to crime, makes his fraudulent scheme all the more aggravating.

Moreover, it also warrants emphasis that Fields committed this fraud day-after-day for years knowing full well that he was causing distress and hardship for his growing roster of victims. Victim A.L. explained the hardship wrought by Fields this way:

> "I applied for this Independent Contractor position online for WaterTek starting at $48,000 a year . . . At the current time I had just moved from Vegas back home to Los Angeles, Ca. with my two youngest daughters and the money from this supposed job was going to help me get into a place. As soon as the money was sent that's when all hell broke loose . . . I wasn't able to move into a place because of the financial loss where my daughters and I were homeless with my daughters staying at one family member's place and me staying at another. It took me over 2 years to get the means to get into a place for me and my daughters and I still haven't fully recovered. I'm still having financial difficulties."

(PSR at 6-7.)

Similarly, as a result of the money lost to Fields's scheme, Victim R.H. explained, "my wife and I were evicted from our home and forced to live in an office building for a period of approximately 6 months. We also had two vehicles repossessed due to the fact that we were not able to make payments. The financial strain that Fields['s] organization has caused upon my family is unmeasurable." (*Id*. at p. 8.) In the same way, Victim J.B. described that:

> "When my involvement with Charles Edward Fields began, I was an unemployed professional with 20 years of corporate sales experience . . . When my machine did not arrive, and Charles did not respond to my emails and

phone calls, the reality of the situation hit me. I had been scammed out of $5,000.00. This fact hit me and my wife like a ton of bricks. This amount was the last of our savings. I had let myself and my wife down. I felt like such a loser. I fell into depression . . . His conscious fraud caused me and many others grief, financial loss and mental anguish."

(*Id.* at p. 8-9.)

Preying upon people in this way has revealed a great deal about Fields's negative characteristics—greed and indifference to his victims, to name a few—that should also be considered in determining an appropriate sentence. The government respectfully submits that a sentence of 63 months within the Guidelines range is appropriate and would account for Fields's history and  characteristics—both the positive and the negative.

### C. *A Guidelines-Range Sentence Appropriately Reflects the Need for the Sentence Imposed to Afford Adequate Deterrence and Promote Respect for the Law.*

A Guidelines-range sentence will also advance to two crucial ends:  promoting respect for the law and affording adequate deterrence.  First, Fields audaciously obstructed justice by concealing and destroying evidence after federal agents executed a search warrant at his residence.  This additionally aggravating and troubling behavior calls into question whether Fields has much, if any, respect for the law (to say nothing of the scant respect for the law evinced by his underlying fraud).  The government seeks a Guidelines-range sentence here to ensure that such obstructive behavior is met with an appropriate sanction.

Second, the government seeks a sentence that will afford adequate deterrence. White-collar criminals, like Fields, "act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." *United States v. Warner*, 792 F.3d 847, 860–61 (7th Cir. 2015).  They are, therefore, "prime candidates for general deterrence."  *Id.* at 860 (quoting *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013)).  *See United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (noting that "economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity" are thus "prime candidates" concerning general deterrence) (quoting *Peppel*, 707 F.3d at 637).  Concerning the need for general deterrence, fraud schemes like Fields's are frequently the subject of a cost-benefit-analysis in which the offenders weigh the rewards with the risk of apprehension and punishment.  In this regard, if Fields's conduct is not punished adequately, it encourages the like-minded to commit similar offenses.

Here, although Fields has admitted to his conduct and lacks a significant criminal history, a low-end guideline range sentence is nonetheless appropriate to have a general deterrent effect. Conduct of this nature is often easy to perpetrate, but it can also be difficult to uncover where, as here, parties like Fields have sole access to funds belonging to others.  This exclusive access to other people's money enables the unscrupulous to then conceal the fraud for an extended period of time, as is the case with Fields.

Also, when, as here, the entirety of the fraud proceeds have already been spent, then there is little recourse left to the victims. A guidelines sentence will convey to Fields—and to other similarly situated parties—that taking money through fraud is no way to get ahead financially and that such conduct will result in severe consequences. Accordingly, a guideline-range sentence at the low end is necessary to achieve the goal of deterrence and to promote respect for the law.

## IV.   <u>Conclusion</u>

For the reasons set forth above, the government respectfully recommends that the Court sentence defendant Charles Fields to a 63-month term of imprisonment plus restitution to the victims in the amount of $598,893.71.

Dated:  March 7, 2024                          Respectfully submitted,

                                               ANDREW M. LUGER
                                               United States Attorney

                               By:   <u>*/s/Matthew S. Ebert*</u>
                                     MATTHEW S. EBERT
                                     Assistant United States Attorney
                                     300 South 4th Street, Suite 600
                                     Minneapolis, MN 55415

16