UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

----------------------------------         Case No.:23CR218 (DSD-DTS)
UNITED STATES OF AMERICA,

PLAINTIFF,

vs.                                          **DEFENDANT'S POSITION**
                                             **REGARDING SENTENCING**

CHARLES EDWARD FIELDS,

DEFENDANT.
----------------------------------

Defendant Charles Edward Fields, by and through his undersigned counsel, hereby

submits and incorporates Defendant's Sentencing Position and the entire report of Amy Butler,

Defendant's Mitigation Specialist which is attached hereto and made a part hereof.

On September 27, 2023, Mr. Charles Edward Fields (D.O.B. 09/27/1979) pled guilty to

Wire Fraud, in violation of 18 U.S.C. § 1343, a Class C felony. The charge stems from events

with occurred on or about August 2015 through January 2020.

Mr. Fields was indicted on June 13, 2023. On June 30, 2023, Mr. Fields appeared on a

summons and was released on bond with conditions. He remained in the community, compliant

with release conditions, while pending sentencing.

In preparation for this report, the undersigned interviewed Mr. Fields, reviewed relevant

discovery materials, and made collateral contacts. Mr. Fields was interviewed in-person and

telephonically. Collateral interviews were completed telephonically.

Mr. Fields's timely guilty plea demonstrates an acceptance of responsibility. This report

is intended to provide the Court with additional information pertaining to 18 U.S.C. § 3553(a)

and mitigation evidence to be considered prior to Mr. Fields's sentencing. In consideration of the

Court's valuable time, the intent is to provide the Court with new information, although there will undoubtedly be some overlap with other reports previously submitted.

## OFFENSE CONDUCT

The instant offense was investigated and presented for prosecution by the Federal Bureau of Investigation (FBI). The details of this offense conduct are included in the Presentence Investigation Report (PSR) submitted by the U.S. Probation Office. This report will summarize and add context as appropriate.

Mr. Fields admits he committed Wire Fraud, in violation of 18 U.S.C. § 1343, a Class C Felony. During my interview with Mr. Fields, he accepted full responsibility for his criminal conduct and expressed considerable remorse.

Mr. Fields acknowledges defrauding numerous individuals. He agrees with the facts of this case. Specifically, Mr. Fields admits he deceived job applicants and did not deliver on his promises. In addition, when victims began to file complaints about him/his business, Mr. Fields admitted to starting new companies and using false personas and aliases to conceal his involvement with these various businesses.

Several times during our interview, Mr. Fields stressed how important it was for me to know he took full responsibility for his criminal conduct. As the Court is aware, the instant offense conduct occurred years ago as of this writing. After time to reflect on this situation, Mr. Fields did hope the Court would consider additional insight into his mindset at the time his criminal conduct began at sentencing.

More specifically, Mr. Fields is adamant his original business intentions were honorable. When determining an appropriate sentence for Mr. Fields, it seems important to consider his past employment history. Prior to starting his own business, Mr. Fields worked in sales and

recruitment industries for several other companies. One of Mr. Fields's earliest work experiences was as an independent contractor for Vector Marketing, selling Cutco knives. When he sold Cutco knives, sales employees were required to provide a refundable security deposit to purchase a set of knives to use for their sales demonstrations.

According to Mr. Fields, Vector Marketing preached the importance of requiring prospective employees to make some sort of financial investment as a way to potentially "weed out" those individuals who were not serious about the job. The rationale behind this practice made sense to Mr. Fields.

While Mr. Fields said he modeled his company after Cutco and this direct sales model, there were several aspects to that business he reportedly went out of his way to avoid. One example of this was Vector Marketing's practice of targeted recruitment of high school and college students. Instead, Mr. Fields described efforts to attract individuals who were established business people or individuals who appeared to have legitimate potential to be successful in the difficult direct sales profession. He further indicated he "said no to people" who clearly lacked business skills.

With the benefit of hindsight, Mr. Fields now recognizes the many flaws in the business practices of Vector Marketing. Mr. Fields moved on from selling Cutco knives, but felt one of his professional strengths was recruiting. Through the years, Mr. Fields worked for other companies as an independent contractor. This meant inconsistent and unreliable income for Mr. Fields and his family. The years 2008-2009 were reportedly a particularly difficult financial time. Around that time, Mr. Fields defaulted on his mortgage and his family lost their home to foreclosure.

This painful experience made Mr. Fields want to "get big and quick" when he decided to

start his own businesses. Mr. Fields reported legitimate interest in water filtration and home

security systems. The exact timeline is unclear, but Mr. Fields reported at one point he became an

authorized dealer for Monitronics, in the home security industry, and was an independent

contractor with Enagic, a manufacturer of water purification products. Public records indicate

both of these companies have also been accused of questionable marketing and/or unethical

business practices.

　　　　Using the recruitment methods used at these other established companies, Mr. Fields

started his company. Per Mr. Fields, his business intended to combine both of these interests.

With humility gained by hindsight, Mr. Fields acknowledged, "I saw myself as financially

successful, but in reality I wasn't."

　　　　Overall, Mr. Fields openly admits to all of the instant offense allegations. Although it

may seem like a small distinction, he does dispute claims his business entities were conceived

with the intent to simply scam people. Instead, according to Mr. Fields, his business was

legitimate when it started. He stated he provided training and equipment to his earliest recruits

exactly as promised. Mr. Fields said he started small when building his first team, but got

"financially greedy." As a result, Mr. Fields built his team faster than he should have, intending

to eventually "weed out" the people who did not belong on his team.

　　　　Mr. Fields did not put the money coming into the business in escrow to cover unexpected

expenses, refunds, etc. Mr. Fields indicated he knew it was wrong, but said he needed that money

to pay some of his personal bills. By his own admission, Mr. Fields also made guarantees he

shouldn't have and failed to account for the fact some people would not be successful at selling

these products.

Mr. Fields explained he tried to run a legal business, but these sloppy accounting and other business practices quickly caught up to him. When some of Mr. Fields's recruits became unhappy, they publicly attacked his reputation. This led to losing customers, upsetting product providers, and mass exits from his training classes.

During my interview with Mr. Fields, he recalled having entire recruiting classes of approximately 20 individuals learning of complaints, getting scared, and then walking out of his training class. Mr. Fields admits he was "not smart" about how he utilized the money paid upfront by his recruits. He was borrowing from the new money to try and fulfill old debts. When suddenly they all wanted their money back, Mr. Fields regrets not having it to give to them.

After enduring the loss of his home, Mr. Fields said he was also scared for his family's future and desperately needed money. He reported this is when the "shady stuff" began and he "started to bend the rules." Mr. Fields admits "the longer it went on, the worse it became." He added, "I made decisions not in line with who I am."

According to Mr. Fields, he convinced himself he would be able to pay the victims back. While Mr. Fields continued to deceive people, he realized it was inevitable that his deceptions would be uncovered. Unfortunately, he was not ready to give up on his companies/dreams. Instead, Mr. Fields tried to work around his bad reputation by creating ailiases and starting new businesses. Mr. Fields now realizes that towards the end of this scheme he was "buying time before it all came crashing down."

When Mr. Fields was informed by his wife the FBI wanted to speak with him, he recalls feeling some relief. Mr. Fields remarked, "I was thankful it happened when it did."

Mr. Fields appeared genuinely saddened to hear of the harm he caused his victims. He

made several comments indicating remorse and regret, such as, "It's amazing that I allowed myself to convince myself what I was doing was justified." Mr. Fields displayed considerable insight and personal growth. For instance, Mr. Fields acknowledged that when committing this crime, "I didn't see the people. I now go to church and pray to not let that lack of empathy happen again."

In preparation for this report, the undersigned reviewed the preliminary PSR submitted by the U.S. Probation Office. As the Court is aware, the document contains a sampling of victim impact statements. Mr. Fields appeared able to appreciate the damage he caused. During my interview with Mr. Fields, he reported a firm commitment to repaying his victims. One of the reasons Mr. Fields is hoping for a shorter period of incarceration is due to a perceived need to repay his victims as quickly as possible.

Mr. Fields reported being humbled by his past mistakes and has taken steps to insure nothing like this happens again. Most notably, Mr. Fields is now working for his family's farm and said he finally has "a clean separation from this business."

Mr. Fields pled guilty to this charge on his birthday, which he said was difficult. Of his pending sentencing, Mr. Fields repeatedly accepted responsibility for his legal situation and simply stated, "it was a bed I made."

It is my understanding Mr. Fields cooperated with authorities during the search of his home, providing information regarding the safe, turning over his laptop, etc. but apparently shredded financial documents related to this case, with Mr. Fields's fingerprints on them, were found months after the search warrant was executed on February 14, 2020. Based on information available to this writer, it appears Mr. Fields has otherwise cooperated with the investigation and complied with the terms of his release.

During my interview with Mr. Fields, he reported the act of accepting responsibility and verbally stating his guilt "lifted a weight" off his heavy conscience. It should also be noted Mr. Fields spoke highly of the agents in charge of his case, appreciating the fact they acted "professional and polite, with a sense of empathy" for him.

## CRIMINAL HISTORY

Mr. Fields has a limited criminal history. This includes three Misdemeanor level charges, Driving Under the Influence (1996, 2016) and Displaying Revoked or Illegal License Plates (2007); and a Petty Misdemeanor speeding charge (2019).

Following the DUI charges, Mr. Fields was placed on probation. Records indicate he was successfully discharged from probation, although this criminal conduct overlapped with his last period of probation.

It should also be noted that Mr. Fields was not criminally charged, but he was previously found civilly liable for past conduct which appears associated with the same businesses involved in the instant federal offense. These liabilities are included in the PSR submitted by the U.S. Probation Office.

As indicated in the PSR submitted by the U.S. Probation Office, Mr. Fields has a criminal history score of 1. This establishes a criminal history category of I.

## CHARACTERISTICS OF THE DEFENDANT

Personal and Family Data:

Mr. Charles Edward Fields is the grandson of Edward Fields, the founder of the family's produce farm, Ed Fields and Sons, Inc. He is one of three children born to his parents, Charles and Estela Fields. Mr. Fields's mother was a migrant worker who met his father while working on the family's farm.

Mr. Fields described himself as "blessed with loving parents." His parents are still married and have a good relationship per Mr. Fields. Mr. Fields did not report any family history of domestic violence or problematic substance use. Instead, Mr. Fields noted he comes from a family "deep rooted" in their Catholic faith. This meant attending church every Sunday, then getting the whole family together for a huge family meal.

Mr. Fields indicated his mother is Hispanic and frequently cooks homemade, authentic Mexican food for the entire family. Apparently this longstanding tradition continues and Mr. Fields remarked how his faith and close family ties are "what's been holding me together."

Mr. Fields began working at his family's farm around age 9. By the time he was 18 years old he says he "knew how to do everything on the farm." In addition to being a hard worker on the farm, Mr. Fields was also a talented athlete. His parents encouraged him to pursue his own dreams and build a life outside of the farm. He enrolled in college and was a "walk-on" to the school's baseball team.

Mr. Fields temporarily left the family business, but he remained close to his parents, siblings, and extended family members. Mr. Fields's father is now in his 70s and Mr. Fields reported, "Dad's body has had enough." When his father asked him to return to work at the farm following these criminal charges, he agreed. This decision has proved beneficial for all involved.

In preparation for this report, the undersigned interviewed Mr. Fields's father. He confirmed Mr. Fields is next in line to run the entire farm and spoke highly of his son's work ethic, saying, "He takes a lot off my shoulders." He also spoke highly of his son's character despite the instant offense conduct. Mr. Charles Fields told this writer, "To me, he's perfect. He's a good father, husband, and employee/owner."

Additional information from my conversation with Mr. Charles Fields is included in the

"Collateral Information" section of this report. However, it should be noted Mr. Fields's father supported his son's determination to repay the money he took from victims. He stated, "Integrity is a strong suit and priority in our family. I will do whatever I can to help him pay restitution."

Siblings:

     Mr. Fields is the middle of three children born to his parents. He has an older brother, Christopher (age 45), and a younger brother, Jarid (age 42). Mr. Fields reported a close relationship with his siblings. He described his role in the family as "the worrier" and added, "to an unhealthy amount."

     Mr. Fields's older brother lives nearby, in Andover, Minnesota. His younger brother lives on the opposite side of his father's property. Mr. Fields does not believe either brother has any criminal history, mental health issues, or substance use disorders. He indicated they remain supportive of him despite his legal situation.

Marriage and Children:

     Mr. Fields met his wife, Katie, when they were both junior high school students. They were together for 7 years prior to marrying nearly 20 years ago on February 9, 2004. He described it as "a snowy wedding on a beautiful day."

     Mr. Fields's wife has a degree in education and spent most of her adult life working as a childcare provider. She reportedly enjoyed this work, but did not earn a lot of money. As a result,

it apparently took a long time to repay her student loan debt. Mr. Fields's wife now works from home for an established recruiting firm.

     Mr. Fields's marriage produced three children: Charles II "Charlie" (age 18), Elizabeth (age16), and Michael (age 14). During our interview, Mr. Fields took time to brag about all of

his

children's accomplishments.

Regarding his oldest son, Mr. Fields joked how he is "much taller and smarter than I am." This child "shocks" Mr. Fields with his incredible work ethic. More specifically, Charlie is a recent high school graduate who works on the family farm full-time while attending night school to become an HVAC technician. (Per Mr. Fields, this knowledge will help with the "tons of refrigeration" their farm requires.) Mr. Fields reported feeling guilt related to the extra burden which will be placed on his young son during any period of incarceration, telling this writer the last and first thing I think every day is, "What is that poor kid going to do?"

Mr. Fields's daughter, Elizabeth, is in her junior year of high school and is a talented 3 sport athlete (basketball, soccer, track), as well as maintaining a 4.1 GPA. He called his daughter's accomplishments "extraordinary." She apparently works in the farm's market.

Finally, Mr. Fields's youngest son, Michael, is a freshman in high school and, according to Mr. Fields, "the best athlete in the family." At the time of our interview, Mr. Fields reported his youngest son was on the honor roll at school and described him as a "people pleaser." Per Mr. Fields, last summer this son "begged me to work on the farm." He agreed to let him and was surprised that his son, along with some of his son's friends, were great employees. Although it was their summer vacation, they were apparently up early every morning weeding fields. Mr. Fields said his son was willing to do "the hardest parts of farming," which obviously made him quite proud.

All of Mr. Fields's children are involved in the family farm. Like his father before him, Mr. Fields indicated their involvement is voluntary. Mr. Fields stated, "I am extremely blessed.

They love and cherish it."

Mr. Fields noted his children are old enough to understand his legal situation. He was aware of the pain and harm his actions caused his family. According to Mr. Fields, his youngest child appears to be having the most difficulty dealing with his upcoming sentencing. To mitigate the situation, Mr. Fields made conscious efforts to surround his son with supportive friends and structure to get him through this difficult time.

During our interview, Mr. Fields made it clear his wife had no involvement with his criminal offense. He reported she was the one who received the phone call from the FBI while they were out of state at one of their daughter's sporting events. In general, Mr. Fields described his wife as "shocked" and "betrayed" by his criminal conduct. To regain her trust and improve their relationship, Mr. Fields and his wife attended couples' therapy together.

As stated by Mr. Fields, "it was a process" to earn back his wife's trust. After counseling, Mr. Fields reported there is now more transparency in his marriage. As surprising as it may seem, Mr. Fields also indicated their relationship is "the best it's been, despite all of this."

To prepare for this report, this writer telephonically interviewed Mr. Fields's wife. She confirmed his self-report and also described the counseling as beneficial. Ms. Fields reported they used to keep their finances separate from each other. She knew his job meant inconsistent income, but was upset her husband did not talk to her about the extent of their financial difficulties. They have since combined finances and she reported he is "an open book now." She also noted witnessing a change in Mr. Fields's thoughts from "I" to "we and us."

In hindsight, Ms. Fields believes "Chuck had a lot of pride and it was hard to not be as successful as he thought he should be." She began crying during our interview, voicing understanding of the harm caused and saying, "It sucks this had to happen to have the kind of

relationship I have now. I have the relationship with my husband I always wanted."

More information from my discussion with Mr. Fields's wife is included in the "Collateral Information" section of this report.

<u>Chemical Health:</u>

There does not appear to be a family history of chemical dependency. Mr. Fields has a history of alcohol use, but did not endorse the use of any controlled substances. As previously mentioned, Mr. Fields's criminal history includes two alcohol related driving offenses. His first DUI occurred at age 16 and his second occurred at age 36. Following Mr. Fields's second DUI, he completed a chemical health assessment and the recommended 2-day alcohol education class.

Mr. Fields acknowledged times in the past when his use of alcohol was excessive, but did not feel his use of alcohol was problematic. It does not appear alcohol played a role in the instant offense. Collaterals also did not report any concerns regarding his use of alcohol.

Mental and Emotional Health:

Mr. Fields was raised in a positive environment. He did not identify any history of trauma, as further evidenced by the Adverse Childhood Experiences (ACEs) assessment score of 0 noted in the PSR submitted by the U.S. Probation Office.

Mr. Fields did not report any current or past mental health diagnoses. His only participation in therapy came following the start of the legal process related to the instant offense. At that time, Mr. Fields sought counseling related to anxiety symptoms as well as relationship issues with his wife.

Mr. Fields found therapy to be beneficial. At the time of our interview, Mr. Fields

reported stable mental health. He did not feel additional counseling was necessary but verbalized a willingness to re-engage in therapy as needed.


Physical Health:

Mr. Fields appears to be in good health. He did not report any chronic or acute physical health concerns and is not currently prescribed any medications.

It should be noted Mr. Fields is a former multi-sport athlete. He continues to live a physically active life, both at work on the farm and in his free time. Mr. Fields also reported eating a healthy diet, full of vegetables from his family's farm.

Educational, Vocational, and Special Skills:

Mr. Fields denied any history of learning disabilities or special education needs. In 1998, he graduated from Anoka High School in Anoka, Minnesota.

As previously mentioned, Mr. Fields was a talented student athlete. After high school, he enrolled in college at St. Cloud State University (SCSU) in St. Cloud, Minnesota. He reported being a "walk-on" for the school's baseball team. He was awarded a $500 scholarship to play baseball for one year. In total, Mr. Fields completed three years of classes towards a business degree, but did not complete his Bachelor's degree program.

Instead, Mr. Fields was recruited by Vector Marketing to sell Cutco knives. As previously

mentioned, this company is known for targeting college students. Judging from the known complaints and judgments against this company, their recruiting techniques and employment practices have been found to be questionable. Mr. Fields did not realize this at the time.

In speaking with Mr. Fields, he noted many people failed at selling Cutco knives but he

was fairly successful. It is my understanding Mr. Fields worked for this company for approximately 7 years and rose the ranks from direct sales to district manager. Towards the end of his career with Cutco, Mr. Fields was responsible for recruiting sales people using the recruitment/sales model taught to him by this company.

Mr. Fields left Cutco for what he felt were better paying opportunities. This included working briefly for Hurion, as a contract recruiter for United Health Group (until they stopped hiring during financial crisis of 2008/2009); at a pre-paid legal services company; and doing home internet/security system sales. Mr. Fields also reported becoming an authorized dealer for Monitronics International, Inc., a home security company; as well as a sales contractor for 3 Enagic Corporation, a water filtration system company which utilizes a direct sales system. It is reported Mr. Fields was affiliated with Enagic from approximately January 2018 until terminated on October 15, 2018. An aspect of the instant offense conduct involves Mr. Fields mischaracterizing the extent of this business relationship to add legitimacy to his businesses.

As indicated earlier in this report, Mr. Fields explained he started a legitimate business, including his affiliation with Enagic. Unfortunately, he did not properly handle complaints/refunds, etc. and the situation was made worse when those complaints led to investigations and his firing, further limiting his ability to fulfill promises made to his eventual victims.

It seems worth noting that through the years, Enagic has also the subject of class action and other lawsuits, including allegations by the Federal Trade Commission (FTC) for illegally claiming to treat or prevent COVID-19, by customers for unlawful telemarketing campaigns, spam calls, and concerns related to exaggerated income claims for sellers.

Mr. Fields insists he began his businesses with good intentions after being "constantly

pitched opportunities." He reportedly modeled his business after these past work experiences in recruiting and direct sales. Despite working long hours, Mr. Fields reported being "always stressed out" and under significant financial burdens, whether working as a contractor or when trying to run his own business. The inconsistency of Mr. Fields's income, along with world events beyond his control, led to unpaid debts and foreclosure of his home.

It is unclear to this writer exactly when things changed, but Mr. Fields admits his desperation to succeed made him become "financially greedy." He reported trying to grow his company faster than prudent and acknowledged, "I should have been more patient." Mr. Fields reported fulfilling some of the recruiting trainings. He also noted past efforts to refund money for as many unhappy recruits as possible. Unfortunately, Mr. Fields used money meant for escrow for his personal expenses and was unable to refund everyone's money. He appeared to genuinely regret this during our conversation.

Following the discovery of Mr. Fields's offense conduct, and the search of their home, Mr. Fields ceased all of his business operations. He described how he and his wife scrambled to make ends meet. According to Mr. Fields, they both felt unsuccessful and challenged each other to find "creative ways for legitimate income." This apparently included shopping for Instacart ("My wife kicked my butt at this"), working as a handyman, and starting a landscaping business. No job was "below" Mr. Fields, he worked as a house keeper, doing lawn maintenance, etc.

Mr. Fields wanted the Court to know he was "not afraid of hard work." After the instant offense conduct, Mr. Fields found a way to stay busy working from 6am-10pm. Most importantly, Mr. Fields did not mind his change of circumstances, instead he reported this was "a cleansing time in my life."

As previously mentioned, Mr. Fields's legal difficulties coincided with a time when his

father found himself without enough help on the family farm. More specifically, an uncle

suffered a stroke and the brother who previously intended to take over the farm left the family

business due to a falling out with another family member. As I understand it, Mr. Fields's mother

asked his father, "Why don't you ask Chuck to come back?" His father apparently responded, "I

don't think he would."

When his father eventually asked him to return to work for Ed Fields and Sons, Mr.

Fields agreed. Having worked on the farm from age 8-18, he says he knew how to do everything

on the farm from a young age. He also knew farming was "a tough business to make money in."

Initially, some family members were skeptical of Mr. Fields's return to the family farm.

He felt a need to prove he was not just there for "a hand out from Dad." Mr. Fields told this

writer, "nobody outworks me" and said it is not uncommon for him to work 14-15 hour days. He

added, "I'm the first one in and the last to leave."

In addition to working long days on the farm, Mr. Fields believes he earned the respect of

other family members based on his willingness to care for an uncle with progressive

supra-nuclear palsy (PSP), a rare neurological disorder which left him "trapped inside his body."

This uncle required 24-hour PCA care that was unavailable during the COVID-19 pandemic. Mr.

Fields took it upon himself to do whatever was necessary to care for his uncle, including cooking

for him, staying overnight, bathing and changing him, etc. He kept his involvement a secret.

When his father and other family members discovered what Mr. Fields was doing for this uncle,

he recalled telling his father there was "nobody to do it" and indicated he was "happy to help."

After "many consecutive years without a profit," Mr. Fields reported the family's farm

doubled its profits in the time since he took over. One of the ways Mr. Fields did this was by

securing a contract to grow carrots and other vegetables for Bolthouse Farms. Mr. Fields is

optimistic that this business partnership will continue to grow and he is also busy figuring out additional ways to continue to grow his family's business.

Mr. Fields reported a commitment to repaying all of his considerable restitution as quickly as possible. This writer spoke with Mr. Fields's father who also indicated a willingness to do all he could to make sure his son's debts gets paid in full.

Regarding his return to the family business, Mr. Fields stated, "the Lord works in mysterious ways." He also stated, "If I'd returned to the farm sooner, I'd be in a much better place."

Prior to Mr. Fields's indictment, he was an active volunteer in his community. This included volunteering to coach his children's sports teams for basketball, football, and baseball. The family farm also donates large amounts of vegetables to organizations in Minnesota.

When asked for specific information, Mr. Fields forwarded an unsolicited letter from Ms. Heidi Coe, the produce sourcing manager for Feeding America and Second Harvest Heartland, thanking him for donating produce. Mr. Fields supplied further details and reported leading an initiative to donate over 1,000,000 pounds of carrots and potatoes to Feeding America and Second Harvest Heartland. He reported, "I am extremely proud of the fact that we exceeded our goal by providing 1.2 million pounds." That was 2023. Mr. Fields's goal moving forward was to exceed 1.5 million pounds of food donations.

In addition, Mr. Fields recalled donating produce to several other community organizations. To name a few recipients of this food donation, Mr. Fields listed the Carmelite Monastery in Lake Elmo, Minnesota; Epiphany Catholic Church and School in Coon Rapids, Minnesota; Andover High School; and St. Patrick's Church in Oak Grove, Minnesota.

When discussing his family's charitable contributions he told this writer, "My grandpa

always said if you can, shovel into the Lord's bin every chance you can and the good Lord will do the same for you in return, and God has the bigger shovel!"

With regard to special skills, it should also be noted Mr. Fields can speak Spanish. This appears

to be related to his mother's Hispanic heritage. As noted in the PSR submitted by the U.S. Probation Office, Mr. Fields also "attained farm-related vocational certifications including a forklift operator certificate, food safety certifications, and Occupational Safety and Health Administration (OSHA) certifications.

Religious Beliefs:

Mr. Fields was raised in the Catholic Church and remains committed to his faith. He reported leaning on his faith during this difficult time.

## COLLATERAL INFORMATION:

To prepare for this report, the undersigned telephonically interviewed Mr. Fields's father, Mr. Charles Fields; and his wife, Ms. Katherine "Katie" Fields. A brief summary of those conversations is provided below for the Court's convenience.

Mr. Charles Fields is Mr. Fields's father. He is the youngest of 8 children born to his father, the founder of Ed Fields and Sons, Inc.

Mr. Charles Fields is aware of his son's legal situation, but found out about his son's financial difficulties after the fact. He stated, "I wish I would have known quite a while ago" (presumably to have prevented it). Charles reported a belief, "a lot of it was pride." He added, "He wanted to do it on his own."

Charles believes his son made one bad decision, then felt the need to keep it up. He further indicated a belief Mr. Fields was "trying to figure out a way to make it right." He stated,

"I feel 100% certain he didn't set out to do financial harm to anyone. In the back of his mind, he really thought he could make it up to people."

According to Mr. Fields's father, he has changed following the discovery of his illegal activities.

Charles is proud of the way his son is now handling his affairs. Charles reported his son is working extra hard because he is intent on paying back what is owed. He expressed gratitude for his son's efforts on the family farm and told this writer, "the farm is doing better with him than with me."

In general, Charles told this writer that Mr. Fields is rather hard working. He noted how sports take a lot of work, too. According to Mr. Fields's father, even as a kid, "he always had his nose to the grindstone, whatever he did." To explain how Mr. Fields could have become involved with the instant offense, his father noted, "I don't think he understood the business management part of it as well as he needed to…and he didn't ask me for advice."

Charles wanted the Court to know, "I will do whatever I can to help with this, too. Integrity is a strong suit and priority in our family." He ended our conversation by stating, "He made a mistake, but still has all of his good traits."

Ms. Katie Fields has known Mr. Fields for nearly 30 years. As previously noted, she was not aware of Mr. Fields's illegal activity. She confirmed attending couples' therapy to process what occurred and indicated their relationship is currently the best it has ever been.

Ms. Fields indicated they used to keep separate accounts. She remembered times when bills went unpaid by her husband. At the time, she felt this occurred due to the inconsistency of her husband's income and an innocent oversight. She now realizes Mr. Fields was too proud to admit he did not have his share of the money required for the family's bills.

Ms. Fields described "a lot of struggle" in the years since this legal process began. She believes her husband has been changed for the better as a result of these charges. Ms. Fields reported knowledge of the direct sales concept and offered Beach Body and Tupperware as smaller-scale examples. More specifically, Ms. Fields understood the pressure in that field to "bring others on." In addition, she pointed out these industries often do ask for an upfront investment "and then it is up to you to sell the stuff."

She does not believe Mr. Fields started his businesses intent on deceiving others. She believes he wanted everyone to be successful. She accepts his explanation that the trouble began with bad reviews causing delays and an inability to get any products. According to Ms. Fields, her husband's behavior was perhaps similar to that of a gambling addict. Namely, he had already processed the funds and needed to borrow more and more from these funds to try to pay off his growing past debts. She believes he continued to (mistakenly) believe he could one day catch up and still be successful in this business venture.

Ms. Fields hoped the Court would consider all of her husband's good traits. She described him as a good father and husband. In addition to volunteering to coach many of their children's teams, Mr. Fields attends all of their games and other activities. Similar to his father, Ms. Fields indicated her husband doesn't want their kids to feel they have to farm.

According to Ms. Fields, Mr. Fields was always a hard-worker. She pointed to his baseball abilities, but also indicated he was a straight A student in college. She believes her husband wanted to start his own business to be like his grandfather, but clearly struggled. Ms. Fields noted it was not easy for him to "tuck his tail and ask his Dad to take care of me."

Ms. Fields became emotional and started crying during our interview. She expressed concern for those involved and indicated a belief her husband is highly remorseful. Per Ms. Fields, Mr. Fields has changed following this offense. Specifically, she pointed to a changed demeanor. She commented, "He was a lot more self-centered before. Now it is is what do we want to do."

Ms. Fields stated, "I wish it were more clear that even at the time, he was not a bad guy." She specified, "He just wanted it to work so badly, it got to a point where he made bad choices." According to Ms. Fields, Mr. Fields was always "putting in time and effort" to be successful. She recalled Mr. Fields suffering from stomach issues and having sleepless nights, which she now realizes was related to "the stress of everything." She added, "He didn't want to let everyone down."

Ms. Fields hoped the Court understood Mr. Fields is willing and able to try to correct his mistakes and make amends. She indicated he is willing to take extra jobs during slow farming seasons, work weekends, etc. to repay what he owes. Ms. Fields ended our conversation discussing how difficult this has been on her children, who she says "ask a lot of questions." Although Ms. Fields is nervous about her husband's upcoming sentencing, it has been hard not having answers to tell them or knowing the consequences.

Please note: Mr. Fields anticipates additional letters of support will be received prior to his sentencing date. These will be forwarded to the Court once received.

## **SENTENCING OPTIONS AND RATIONALE:**

The Sentencing Guidelines are advisory and their application is a matter that falls solely within the Court's discretion.

In determining an appropriate sentence, the Court shall impose a sentence sufficient, but not greater than necessary, to comply with the factors set forth in 18 U.S.C. § 3553(a). These factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; the need to protect the public from further criminal conduct; the need to provide the defendant with needed educational or vocational training, medical care, or other corrective treatment in the most effective manner; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

Mr. Fields is a married father of three, with limited criminal history. He has never experienced any period of incarceration. Mr. Fields takes full responsibility for this criminal conduct and expressed considerable remorse during our interactions.

When considering the circumstances of the offense, it does appear Mr. Fields's participation in this offense conduct relates to personal financial difficulties. Many of Mr. Fields's basic business practices were taught to him by established companies, but he admits he "bent the rules" and then deliberately acted illegally. While I recognize the harm this fraud caused his victims, there is nothing in Mr. Fields's history to suggest he began the business with the intended outcome in mind.

Instead, Mr. Fields has a history of being a productive, upstanding member of society. He has strong, close ties to his family and community. Based on Mr. Fields's history of volunteering his time and substantial charitable donations, he has a particular ability to benefit society.

Mr. Fields is a religious man and his remorse appears genuine. He admits his many mistakes and has received counseling to process what occurred. Collaterals believe Mr. Fields genuinely tried to make these business ventures work but was too proud to realize or acknowledge when he was not successful. As a result, Mr. Fields ended up digging a deeper and deeper hole he could not (legally) get out of. During our interview, Mr. Fields admits to feeling he was "buying time" when committing this offense and he stated, "I was insane enough to keep trying."

To his credit, Mr. Fields swallowed his pride and returned to the family business after this conduct was uncovered by the FBI. By all accounts, this has been a positive change which provides Mr. Fields a viable financial resource to avoid future crime. Mr. Fields appears quite determined to put his legal difficulties behind him and make amends to his victims. He sympathizes with the financial difficulties of his victims and plans on repaying them as soon as possible. He told this writer, "I will conquer this. I will make it right."

Mr. Fields understands the applicable Sentencing Guidelines call for imprisonment. While he can appreciate the need for punishment, he hopes the Court will consider a downward departure from the guideline imprisonment range. His request is largely due to the fact incarceration will interfere with his ability to work and pay the agreed upon victim restitution.

This writer would respectfully agree that a downward departure appears appropriate in this case. The appropriateness of a departure is not solely based on the need to ensure or accelerate payment of restitution. In addition to making victim restitution a priority, a lengthy period of incarceration does not appear necessary to protect the public from Mr. Fields or deter future criminal conduct. This is based on Mr. Fields's social history and limited criminal history,

but also due to the fact he has no identifiable needs for correctional treatment or other programming.

Based on all of the above information, the advisory sentencing guidelines range of imprisonment appears greater than necessary to comply with the factors set forth in 18 U.S.C. §3553(a).

## ISSUES

To summarize the issues in regard to a proper sentence for Charles Fields there are a number of issues, all discretionary in helping the Court to fashion the most suitable sentence;

1.      How does the calculated loss, being at the absolute, if not below, the Guideline level impact a proper sentence?

2.      How should the obstruction issue factor into the sentence, if at all?

3.      Does this case, and the average loss of about $2,500-$3,000. satisfy the standard for substantial loss? It is hard to believe there would ever be an insubstantial loss.

4.      Does the fact that Charles has gone back to actually putting his hands in the dirst for a career and pledges that when he inherits the farm he will mortage it to benefit of the victims have an impact on his sentence and how soon he can get back to his life and work?

In response to the above:

1.      The low end of the Guideline does not seem to be a sufficient adjustment in this case. In this District it seems that when the bottom of the Guideline level is reached discretion allows moving down at least one level. It clearly should be true when the dollar amount is actually below the lower level of what was agreed

upon.

2.      The obstruction issue in this case is a bit foggy. After having home and office

searched and many documents and computers seized, the defendant felt the

investigation was over and he had been caught. He retained counsel. He had every

reason to believe the investigation was over and the Government had what it

wanted. No real showing has been made that defendant was aware the

investigation would be ongoing when the Government had already, with

defendant's knowledge, seized everything desired.

3.      The defendant has been taxed for causing substantial financial harm to a

multiplicity of people. The average loss here is about $2,500.00. What is

substantial? To a number of people $2,500.00 seems substantial but rarely; the

standard is more objective than that. During the time period in issue we would

concede the "substantial impact" of the loss of $2,500 but that does not fulfill

some type of objective standard that must be present.

Somewhere the definition of substantial should be set forth in the multiplicity

branch of the enhancement. It is not. Surly there must be a standard parsing the

enhancement or eliminating.

4.      How many defendants actually change their direction in life to this degree. Mr.

Fields was raised putting crops in the ground. He has gone back to it with a

vegeance. He is the farmer now he should have always been. He gets up early and

works the fields. He has taught his son the merits of hard work. He plants,

fertilizes, raises and harvests vegetables; then gets them to market. He has agreed

that upon inheriting the farm from his father he will encumber it to the complete

benefit of the victims. It is rare that such restitution occurs.

So what is a fair sentence in this case? We respectfully suggest 23-32 months.


Respectfully submitted,


Dated: _April 9, 2024_                    By: _s/ Joseph S. Friedberg_
                                          Joseph S. Friedberg
                                          Attorney I.D. No. 32086
                                          Attorneys for Defendant
                                          701 Fourth Avenue South, Suite 300
                                          Minneapolis, Minnesota 55415
                                          Telephone: (612) 339-8626